UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

CLARA RENEE PRATT,                    :
                                      :CIVIL ACTION NO. 3:15-CV-1313
          Plaintiff,                  :
                                      :(JUDGE CONABOY)
          v.                          :
                                      :
CAROLYN W. COLVIN,                    :
Acting Commissioner of                :
Social Security,                      :
                                      :
          Defendant.                  :
                                      :

_____

## MEMORANDUM

Here we consider Plaintiff's appeal from the Commissioner's denial of Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act.  (Doc. 1.)  The Administrative Law Judge ("ALJ") who evaluated the claim, Jarrod Tranguch, concluded in his December 2, 2013, Decision that Plaintiff's severe impairments degenerative disc disease of lumbar spine, status post lumbar spine surgery and revision surgery, diabetes, depression, and anxiety did not alone or in combination meet or equal the listings.  (R. 18-19.)  He also found that Plaintiff had the residual function capacity ("RFC") to perform sedentary work with certain nonexertional limitations and that she was capable of performing her past relevant work as a housekeeper, a light duty and unskilled position, as well as other light duty jobs that existed in significant numbers in the national economy.  (R. 24-26.)  The ALJ therefore found Plaintiff had not been disabled under the Act from July 26, 2011, the alleged

disability onset date, through the date of the decision.  (R. 26.)
After reviewing the ALJ's decision, the Appeals Council issued a
decision on May 6, 2015.  (R. 4-7.)  The Appeals Council concluded
Plaintiff was unable to perform her past relevant work as a
housekeeper but she had the capacity to perform a significant
number of jobs in the national economy and was therefore not
disabled through the date of the ALJ's decision, December 2, 2013.
(R. 7-8.)

     With this action, Plaintiff argues that the decision of the
Social Security Administration is error for the following reasons:
1) there is a lack of substantial evidence to support the ALJ's
rejection of Plaintiff's treating providers (Doc. 11 at 5); and 2)
the Appeals Council erred in refusing to consider new evidence
which was unavailable at the time of the hearing (*id.* at 9).  After
careful consideration of the administrative record and the parties'
filings, I conclude Plaintiff's appeal is properly granted and the
case remanded for further consideration.

## I. Background

### A.   *Procedural Background*

     Plaintiff protectively filed applications for DIB and SSI on
August 27, 2012.  (R. 16.)  Plaintiff alleged disability beginning
on July 26, 2011.  (*Id.*)  The claims were initially denied on
November 8, 2012, and Plaintiff filed a request for a hearing
before an ALJ on December 20, 2012.   (R. 16.)  Plaintiff,

represented by Attorney Jonathan Butterfield, testified at the ALJ hearing on November 13, 2013, as did Vocational Expert ("VE") Karen Kane.  (R. 16, 50.)  As noted above, the ALJ issued his unfavorable decision on December 2, 2013, finding that Plaintiff was not disabled under the Social Security Act during the relevant time period.  (R. 59.)

Plaintiff filed a Request for Review with the Appeals Council. (R. 10-12.)  On March 2, 2015, the Appeals Council notified Plaintiff that it had granted the request for review, adding that it proposed to issue an unfavorable decision but it would consider any timely filed comments or new and material evidence.  (R. 4.) Comments and additional evidence were received and considered. (*Id.*)  The Appeals Council concluded that the new information did not affect the decision about whether Plaintiff was disabled beginning on or before December 2, 2013, the date of the ALJ's decision, because the new information was about a later time. (*Id.*)  The Appeals Council agreed with the ALJ's findings regarding Steps One through Three, and also agreed with his RFC assessment and evaluation of the evidence of record.  (R. 5.)  However, the Appeals Council disagreed with the ALJ's Step Four determination that Plaintiff was capable of performing her past relevant work as a housekeeper and the ALJ's alternative Step Five finding that Plaintiff could perform a significant number of unskilled light jobs in the national economy.  (R. 6.)  Despite the disagreement,

the Appeals Council concluded that the ALJ had posed a hypothetical to the VE that included all limitations identified in the ALJ's RFC and, based on the VE's testimony that Plaintiff could still perform the unskilled sedentary jobs of surveillance-system monitor, addressing clerk, and assembler of small parts, the Appeals Council found Plaintiff "not disabled" at any time through the ALJ's decision of December 2, 2013.  (R. 6-7.)  This Decision was the final decision of the Acting Commissioner.  (R. 1.)

On July 2, 2015, Plaintiff filed her action in this Court appealing the Acting Commissioner's decision.  (Doc. 1.)  Defendant filed her answer and the Social Security Administration transcript on September 21, 2015.  (Docs. 9. 10.)  Plaintiff filed her supporting brief on October 9, 2015.  (Doc. 11.)  Defendant filed her opposition brief (Doc. 14) on December 7, 2015, after requesting, and being granted, an extension of time within which to do so (Docs. 12, 13).

**B.  *Factual Background***

Plaintiff was born on August 27, 1965, and was forty-five years old on the alleged disability onset date.  (R. 25.)  She has a seventh grade education and past relevant work as a housekeeper. (R. 24-25.)

**1.  Impairment Evidence**

At the ALJ Hearing, Plaintiff's attorney stated that Plaintiff's back pain and recuperation from surgery together with

4

her depression made her unable to work.  (R. 56.)  Based on this assertion, I focus on evidence of record related to these impairments.

The Discharge Summary from Susquehanna Health dated December 16, 2011, indicates that Plaintiff had been admitted on December 7, 2011, from the Williamsport Hospital Emergency Room "on a 201 basis" due to depression and suicidal ideation without any specific plan.  (R. 235.)  She reported that her depression had worsened over the preceding few months although she had depression for approximately ten years.  (*Id.*)  The Summary indicates that at the time of admission Plaintiff was supposed to have been taking Paxil, 40 milligrams per day, and Ambien, 10 milligrams at night, but she had not taken the Paxil for about three weeks prior to admission. (*Id.*)  She was prescribed Effexor as an alternate and broader acting antidepressant.  (*Id.*)  Plaintiff continually improved throughout her stay and, upon discharge, she reported her depression to be much improved.  (R. 236.)  Plaintiff denied any suicidal or homicidal ideation, and her affect was broader though slightly constricted.  (*Id.*)  She was diagnosed with major depression, recurrent and severe, and anxiety disorder, not otherwise specified.  (*Id.*)  He GAF was assessed to be 50.  (R. 237.)  Plaintiff was discharged home with therapy and medication management to continue at Community Services Group.  (*Id.*)

August 25, 2012, Triage records from Williamsport Regional

5

Medical Center Emergency Department indicate Plaintiff was seen for a toothache and, in the intake process was asked several mental health related questions.  (R. 233.)  She answered "no" to the questions of whether she had recently felt down, depressed, or hopeless and whether she had thoughts of harming or killing herself; she answered "yes" to the question of whether she had "recently thought of harming or killing others."  (*Id.*)

On September 17, 2012, Plaintiff was seen for medication management by Douglas Reed, M.D., a psychiatrist at Community Services Group.  (R. 290-92.)  Dr. Reed noted that Plaintiff reported she had superficially cut her wrist with passing suicidal ideation a few weeks earlier when she had conflict with her older daughter and they were getting along better at the time of her visit.  (R. 290.)  She also talked about her application for Social Security benefits, stating "she was turned down in part because she was volunteering at the time and was told not do this as it weakened her SSI case."  (*Id.*)  Plaintiff also reported she was generally taking three Atarax a day and had stopped counseling in May due to missing appointments.  (*Id.*)  Mental status examination showed that Plaintiff was alert and wired up, her affect was incongruent and blunt, her thought form was linear, her insight and judgment were fair, and her cognitive functions appeared to be at baseline.  (R. 290-91.)  Plaintiff's diagnosis was Major Depressive Disorder, Recurrent, Severe Without Psychotic Features and her GAF

6

score was 60.  (R. 291.)  Dr. Reed did not change any medications and recommended that Plaintiff restart counseling and return for followup in six weeks.  (R. 291.)

On September 30, 2012, Plaintiff was again seen for dental pain at Williamsport Regional and answered "no" to all questions posed in the self-harm assessment.  (R. 247-48.)

October 12, 2012, Community Health Center Patient Chart notes indicate that Plaintiff saw Physician Assistant Leonard Weber to address her hyperlipidemia.  (R. 381.)  In the course of the visit, Plaintiff presented Mr. Weber with a form to be completed for SSI. (*Id.*)  He stated that "[s]he is applying based on her depression/anxiety.  I filled out the form with pt helping with responses.  She is followed by Dr. Reed, psychiatrist and I specified on the form that he should make the ultimate determination of her mental status."  (*Id.*)  Mr. Weber added that Plaintiff stated that she felt suicidal two days earlier but did not feel that way at the time of her visit.  (*Id.*)  He also noted that she did not have a plan and had contracted for safety.  (*Id.*)

On December 8, 2012, Plaintiff saw Dr. Reed for medication management.  (R. 596.)  She reported that she was more irritable on a daily basis, was getting angry with her son especially, she had gone to the ER for Valium and asked Dr. Reed for more, she stopped taking Atarax because it made her too tired, and she was pursuing SSI.  (*Id.*)  Plaintiff's mental status exam showed Plaintiff to be

7

irritable at times but her affect was calm, her thought linear, and her insight and judgment fair. (*Id.*)  Dr. Reed adjusted Plaintiff's medications and assessed a GAF score of 55.  (R. 597.)

On November 6, 2012, Plaintiff saw Mr. Weber complaining of worsening depressive symptoms.  (R. 763.)  She stated she had been feeling depressed for the preceding week and, though she admitted thoughts of suicide, she denied a plan and contracted for safety. (*Id.*)  She rejected an ARC consultation or referral to the ER for possible admission but planned to call Dr. Reed's office the next day.  (*Id.*)

On December 11, 2012, Plaintiff again saw Mr. Weber who noted the medical problems to be addressed included depression.  (R. 761.)  Plaintiff reported she was doing a little better and she was eating and sleeping well.  (*Id.*)  She also said she was unhappy with Dr. Reed and had an appointment with a new psychiatrist the following day.  (*Id.*)  Plaintiff's physical exam was normal, including psychiatrically.  (R. 762.)  She was to follow up in three months.  (*Id.*)

On January 7, 2013, Plaintiff was seen at Williamsport Regional Medical Center Emergency Department for back pain.  (R. 480.)  Plaintiff reported that beginning ten days prior to her Medical Center visit, she had numbness down her left leg into her toes and had left leg pain.  (*Id.*)  Plaintiff again answered "no" to all of the self-harm questions.  (*Id.*)  Plaintiff was prescribed

pain medication and Prednisone and instructed to limit lifting and strenuous activity and not to work that day or the next.  (R. 479.) She was also directed to follow up with her own doctor if not better.  (*Id.*)

At Plaintiff's January 9, 2013, medication management visit with Dr. Reed, Plaintiff reported increased anxiety.  (R. 594.) Dr. Reed noted that Plaintiff presented as alert, with normal speech, irritable mood, anxious at times, baseline cognitive functions, and fair insight and judgment.  (R. 594.)  Dr. Reed prescribed a trial of Clonazepam and discussed the risk of addiction.  (R. 595.)  He reduced the Effexor dosage, discontinued Ambien and Atarax, assessed a GAF score of 60, and wanted to followup in six weeks.  (*Id.*)

Plaintiff's February 4, 2013, medication management visit with Dr. Reed was essentially the same as her January visit but he switched her from Clonazepam to Ativan.  (R. 592.)  Dr. Reed assessed a GAF score of 55 and noted that he filled out DPW paperwork.  (*Id.*)  In a February 20, 2013, phone call, Plaintiff demanded Ambien and Xanax; Dr. Reed offered Trazadone but Plaintiff refused.  (*Id.*)  She also said she needed a note with her diagnosis and Dr. Reed agreed to provide that or her records. (*Id.*)

On March 14, 2013, Plaintiff was again seen at Williamsport Regional ER for "[c]hronic back pain: lumbar area with sciatica."

9

(R. 499.)  She was prescribed Flexeril for muscle spasm and Ultram for pain.  (*Id.*)  She was directed to follow up with her own doctor if not better.  (*Id.*)  Plaintiff again answered "no" to all of the self-harm questions.  (R. 500.)

At her March 18, 2013, medication management visit, Plaintiff complained that Ativan made her tired and she did not like the way it made her feel.  (R. 589.)  She also reported that she had a disability hearing coming up.  (*Id.*)  Her mental status exam was essentially the same as in February and her GAF was 55.  (R. 589-90.)

On March 20, 2013, Plaintiff saw Hani J. Tuffaha, M.D., a neurosurgeon, on Mr. Weber's referral for the management of low back pain.  (R. 628.)  Plaintiff described low back, left buttock and left posterolateral leg pain into the second, third and fourth toes.  (*Id.*)  She reported she had the pain since December 2012 with no precipitating trauma and no previous history of similar symptoms.  (*Id.*)  She said the pain was worse when sitting, lying down, and standing.  (*Id.*)  Plaintiff also reported that she had no significant medical problems and she was taking no medications at the time.  (*Id.*)  After physical examination and review of the MRI dated February 27, 2013, Dr. Tuffaha's impression was "[i]ntractable severe left S1 radiculopathy."  (R. 628.) Concerning recommendations, he noted that he had discussed further therapeutic options, including lumbar laminectomy versus

conservative treatment.  (*Id.*)  Plaintiff said she wanted to try pain management prior to considering surgery.  (*Id.*)  Dr. Tuffaha prescribed Neurontin and referred Plaintiff to Dr. Rigal for pain management.  (*Id.*)

On April 1, 2013, Plaintiff was seen by Ayaz Mahmood Khan, M.D.  (R. 514.)  She had been referred to Dr. Khan for lower back pain which had started in December 2012 after she lifted some heavy equipment.  (R. 515.)  She reported severe low back pain which was gradually worsening.  (*Id.*)  Plaintiff said she worked as a cleaner but was unable to work at the time of her visit.  (R. 515.)  Dr. Khan commented that a recent MRI of the lumbar spine showed disc bulging at L3-4, broad based posterior disc protrusion with facet arthritis at L4-5, a left paracentral and foraminal disc herniation at L5-S1 that was effacing the left lateral recess and appeared to be impinging the descending left S1 nerve root.  (*Id.*)  On physical exam, Dr. Khan noted that Plaintiff was distressed because of pain which she described at 10/10.  (R. 518.)  Inspection and palpation of the lumbar spine was not within normal limits: she had tenderness over the lumbar spine with paravertebral muscle spasm; spinal curves were not normal with loss of lumbar lordosis; range of motion was not within normal limits due to pain; SLR was positive on the left at 40 degrees; she had tenderness on the left SI joint; and Patrick's test was positive.  (R. 519.) Psychiatrically Dr. Khan noted no problems.  (*Id.*)  He diagnosed

11

lumbar disc disease, lumbar radiculitis, sacroilitis, lumbago, and nondependent tobacco use disorder.  (*Id.*)  He prescribed Oxycodone and Zonegran for pain and Voltaren.  (R. 520.)  In his Care Plan, Dr. Khan stated that the herniated disc at L4-5 and L5-S1 would benefit from a series of injections.  (*Id.*)  He discussed the use of opioids and dependence, talked about tobacco cessation, and advised Plaintiff to continue physical therapy.  (*Id.*)

On April 4, 2013, Plaintiff received an injection (Caudal ESI) and requested a refill of her pain medication.  (R. 522.) Plaintiff had a followup visit with Dr. Khan on April 8, 2015.  (R. 528.)  She requested a refill of the pain medication Tramadol and Dr. Khan agreed.  (*Id.*)  She said the injection seemed to be helping her pain. (*Id.*)

On April 11, 2013, Plaintiff was seen at Williamsport Regional ER for acute back pain.  (R. 533.)  She was prescribed Naproxin and Ultram for pain and directed to follow up with her doctor the next day.  (*Id.*)  Plaintiff again answered "no" to all of the self-harm questions.  (R. 533-34.)

On May 30, 2013, Plaintiff underwent a left L5-S1 laiminectomy, foraminotomy, and diskectomy performed by Dr. Tuffaha.  (R. 602.)  She did extremely well postoperatively and was pain free for a time. (*Id.*)

At her May 15, 2013, medication management visit, Plaintiff reported problems with medications and some down moods with crying

spells.  (R. 587.)  Her mental status exam was similar to previous visits, her diagnosis unchanged and her GAF assessed to be 60.  (R. 587-88.)  Dr. Reed adjusted Plaintiff's medications and wanted to see her again in eight weeks.  (R. 588.)

In a June 12, 2013, letter to Mr. Weber, Dr. Tuffaha noted that he had reevaluated Plaintiff that day.  (R. 619.)  He found that she was doing extremely well, was pain free, and was walking a half mile a day.  (*Id.*)  Dr. Tuffaha stated that he had asked Plaintiff to increase her activities as tolerated and anticipated that she would be able to return to work in early September.  (*Id.*)  He planned to reevaluate Plaintiff on an as-needed basis.  (*Id.*)

On July 16, 2013, Plaintiff was seen at Williamsport Regional Emergency Department for depression.  (R. 546.)  Plaintiff reported that she had recently felt down, depressed or hopeless and also had experienced less interest or pleasure in doing things.  (R. 546-47.)  Plaintiff reported that she had experienced situational problems but was compliant with medication, she had depression and anxiety, and her symptoms were mild.  (R. 550.)  On physical examination, Plaintiff appeared depressed, cognition was normal, thought processes and content were normal, and insight and judgment were normal.  (R. 551.)  Plaintiff wanted to go home and did not want to talk to mental health.  (R. 552.)  She was discharged in stable condition.  (*Id.*)

On July 17, 2013, Plaintiff again saw Dr. Reed for medication

13

management.  (R. 585.)  In the Interim History portion of his notes, Dr. Reed recorded that Plaintiff had back surgery on June 30, 2013.  (*Id.*)  She reported that her mood was generally a little better and she was not in counseling.  (*Id.*)  Her mental status exam was basically the same as in May and her GAF score was 60.  (*Id.*)

On July 24, 2013, Plaintiff saw Mr. Weber for follow up of back surgery.  (R. 726.)  She reported that she had back surgery on June 30, 2012, performed by Dr. Tuffaha. (Id.)  Plaintiff presented with low back pain, most prominent in the lower lumbar spine radiating to the left calf.  (*Id.*)  Mr. Weber checked with Dr. Tuffaha's office and was advised to order an MRI and refer Plaintiff back to Dr. Tuffaha if anything was abnormal.  (R. 729.)

On July 30, 2013, Plaintiff saw Yekalo Beyene, M.D., at Susquehanna Community Health for back pain and spasm which had begun five days earlier.  (R. 723.)  She said her symptoms were aggravated by movement in general and walking.  (*Id.*)  Plaintiff had a slowed gait, tenderness on palpation of the lumbar spine, and she was unable to do a straight leg raise.  (R. 725.)  Dr. Beyene assessed muscle spasm, noting that her pain and spasms were not supported by the physical exam.  (R. 725-26.)  He stated that Plaintiff "might be physically dependent on opoids [sic] she will benefit from detox program.  I will no circumstances will prescribe opoids [sic] including tramadol.  I WILL BE HAPPY TO TREAT ALL HER

14

CHRONIC MEDICAL PROBLEMS EXCEPT PAIN." (R. 726.) This assessment followed Dr. Beyene's review of documentation in Plaintiff's chart concerning controlled substances in which he found Plaintiff had filled fourteen controlled substance prescriptions, prescribed by six different providers, at four pharmacies in the second quarter of 2013. (R. 725-26.)

On August 6, 2013, Plaintiff visited Williamsport Regional for chronic back pain. (R. 563.) Physical examination showed that Plaintiff had a limited range of motion in her back and had difficulty standing. (*Id.*) She was prescribed Prednisone and advised not to engage in strenuous activity and not to work for two days. (R. 563.) Plaintiff again answered "no" to all of the self-harm questions. (R. 564.)

On September 6, 2013, Plaintiff underwent a lumbar myelogram which showed a recurrent HNP L5-S1 and moderate L4-L5 disc bluge with mild to moderate spinal stenosis. (R. 602.)

Also on September 6, 2013, Dr. Tuffaha completed a Commonwealth of Pennsylvania Department of Public Welfare Medical Assessment Form. (R. 577-79.) He listed a primary diagnosis of lumbar radiculopathy and noted that Plaintiff was following the prescribed treatment plan. (R. 578.) Dr. Tuffaha indicated that Plaintiff's condition would preclude her from participating in any form of employment on a sustained basis until "at least 1/1/14." (R. 579.)

15

Plaintiff was admitted on September 24, 2013, for a left L5-S1 laminectomy, foraminotomy, and diskectomy due to "intractable exacerbation of left S1 radiculopathy." (R. 603.) The postoperative diagnosis was "[r]ecurrent disk extrusion at L5-S1, central and left, with intractable exacerbation of left S1 radiculopathy, probably post traumatic." (R. 606.)

On September 30, 2013, Plaintiff again saw Dr. Reed for medication management. (R. 580.) She reported that she had another back surgery the previous week, her mood was ok, and she was tolerating her medications. (*Id.*) Plaintiff's mental status exam was basically normal except that she admitted occasional suicidal ideation, homicidal ideation and paranoid delusions. (*Id.*) Her diagnosis continued to be Major Depressive Disorder, Recurrent, Severe Without Psychotic Features. (R. 581.) Her GAF score was assessed at 60. (*Id.*)

In correspondence dated October 4, 2013, Dr. Tuffaha reported to Mr. Weber that he had seen Plaintiff that day. (R. 601.) Dr. Tuffaha said she reported marked improvement of the left leg pain and expected low back pain at the early post-operative stage. (*Id.*) He planned to reevaluate Plaintiff in four weeks. (*Id.*)

On November 4, 2013, Plaintiff saw Dr. Beyene following a transition of care from the emergency department where she had gone for back pain and was given various pain medications, including a prescription for Tramadol. (R. 708.) Dr. Beyene again noted that

16

he would not refill any pain medications, including Tramadol, and recommended a daily aspirin, omega-3 fish oil, that Plaintiff adhere to a diabetic diet and lose weight.  (R. 710.)

In his November 6, 2013, correspondence to Mr. Weber, Dr. Tuffaha said that Plaintiff reported at her office visit that day that she had severe exacerbation of her left low back pain associated with left post lateral leg pain over the preceding few weeks.  (R. 839.)  Dr. Tuffaha recorded the following examination findings:

> Examination of the low back reveals moderate limitation of range of motion at the waist on posterior extension and mild limitation in all other directions.  Left leg raising up to 75 degrees, in the supine position, results in increased pain.  Right straight leg raising up to 90 degrees, in the supine position, results in no difficulty. Motor examination reveals no definite deficit. Sensory examination reveals no deficit.  She changes positions cautiously.

(*Id.*)  Dr. Tuffaha opined that the recent exacerbation could be inflammatory.  (*Id.*)  He requested that Plaintiff continue her medications and try to walk daily, keeping in mind that she feels better when she walks.  (*Id.*)  He planned to reevaluate Plaintiff in three months.  (*Id.*)

Plaintiff now also submits a letter from Dr. Tuffaha to Mr. Weber dated January 10, 2014.  (Doc. 11-1 at 1.)  Dr. Tuffaha indicated he examined Plaintiff that day and detailed his examination findings.  (*Id.*)  He reported the following

17

"Impression": "1) Multifactorial L4-L5 spinal stenosis[;] 2) Status post left L5-S1 laminectomy and discectomy with no evidence of residual or recurrent HNP[;] 3) Improved depression/anxiety with Zoloft." (*Id.*)  Under "Recommendations," Dr. Tuffaha stated "I continue to feel she is disabled for substantial gainful employment.  I asked her to continue the modified activities and medications.  I will re-evaluate her in two months." (*Id.*)

Also on January 10, 2014, Dr. Reed completed a Pennsylvania Department of Public Welfare Medical Assessment Form.  (R. 840-42.) He indicated that Plaintiff was disabled due to major depressive disorder.  (R. 841.)

## 2.  **ALJ Hearing**

Plaintiff testified at the November 13, 2013, ALJ Hearing that she completed seventh grade and left school because of problems at home.  (R. 60.)  She also noted that she had last worked about three years before and she had worked at the Genetti Hotel as a housekeeper for about eight years.  (R. 60-61.)  Plaintiff said she had not worked at all in any capacity since July 2011 because she was told by her doctor not to work, just to take care of herself and her son after she "fell into depression and . . . didn't want to live, a lot of crying, isolating." (R. 62.)  She testified that she remained in pain after her second back surgery, medication helped some but there were side effects, and the pain affected her ability to do things including walking.  (R. 63-65.)

18

VE Karen Kane testified that Plaintiff's housekeeping position was light duty and unskilled. (R. 76.) She said that this position could be performed by an individual with the same age, education and work experience as Plaintiff who could occasionally lift and carry twenty pounds, frequently lift and carry ten pounds, stand and or walk for at least six hours, and occasionally bend, balance, stoop, kneel, crouch, use ramps and climb stairs, but should avoid occupations that require crawling or climbing on ladders, ropes or scaffolds, avoid concentrated exposure to wet or slippery conditions, vibration and should avoid workplace hazards such as unprotected heights and moving machinery, and could perform work that is described as unskilled involving simple, routine tasks that are not performed in a fast paced production environment but could perform work that is considered low stress involving only occasional simple decision making, and occasional changes in work duties and work setting. (R. 76-77.)

In the next hypothetical the VE was asked to assume the same individual with the added limitation that she could stand and/or walk for no more than two to three hours in an eight-hour day and would need some flexibility with regard to a sit/stand option every hour or so. (R. 78.) The VE testified that the added limitations would drop the level down to sedentary and such a claimant could perform the positions of video monitor surveillance and addressing clerk. (*Id.*) She also testified that if the limitation were added

that the individual could lift and carry mor more than ten pounds, the same positions would be available without erosion.

Finally, ALJ Tranguch asked the VE to assume the limitations from the first three hypotheticals combined and also assume that "due to problems with sleep, bouts of depression, the side effects of medication, complaints of pain, difficulty with social interaction, the individual would be expected to be off task 20 percent or more of the workday, and or would be expected to be late to work, absent from work or would have to leave early from work two or more days per month." (R. 80.)  The ALJ responded that there would be no jobs available within the workforce for such a person.  (*Id.*)

3.   **ALJ Decision**

In his December 2, 2013, Decision, ALJ Tranguch made the following Findings of Fact and Conclusions of Law:

> 1.   The claimant meets the insured status requirements of the Social Security Act through June 30, 2012.
>
> 2.   The claimant has not engaged in substantial gainful activity since July 26, 2011, the alleged onset date (20 CFR 404.1571 et seq. and 416.971 et seq.).
>
> 3.   The claimant has the following severe impairments: degenerative disc disease of the lumbar spine, status-post lumbar spine surgery and revision surgery; diabetes; depression; and anxiety (20 CFR 404.1520(c) and 416.920(c)).
>
> 4.   The claimant does not have an impairment or combination of impairments that meets

20

Case 3:15-cv-01313-RPC   Document 15   Filed 12/16/15   Page 21 of 32


or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a range of sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a).  She can stand and walk for 2 to 3 hours in an 8-hour day and can sit for up to 6 hours, but needs the flexibility to change positions every hour or so.  She may occasionally bend, balance, stoop, kneel, crouch, use ramps and stairs, but should avoid crawling or climbing on ladders, ropes or scaffolds.  She should avoid concentrated exposure to wet or slippery conditions, vibrations and workplace hazards such as unprotected heights and moving machinery.  She can do unskilled work, involving simple, routine tasks that are not performed in a fast-paced production environment. She can perform work that is low stress, involving only occasional simple decision making and occasional changes in work duties and work setting.  She may have occasional contact with customers and members of the general public, as well as occasional contact with co-workers and supervisors.

6. The claimant is capable of performing past relevant work as a housekeeper. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565 and 416.965).

7. The claimant has not been under a disability, as defined in the Social Security Act, from July 26, 2011, through the date of this decision (20

CFR 404.1520(f) and 416.920(f)).

(Doc. 10-2 at 18-26.)

**4.   Appeals Council Decision**

On May 6, 2015, the Appeals Council issued its decision.  The
Appeals Council rejected the additional evidence Plaintiff had
submitted: medical evidence dated February 3, 2014, through
December 12, 2014, from Community Services Group; and medical
evidence dated December 19, 2013, through February 21, 2014, from
Hani J. Tuffaha, M.D.  (R. 4.)  The Council said that because the
ALJ decided the case through December 2, 2013, the new information
was about a later time, and therefore did not affect the decision
about whether the plaintiff was disabled beginning on or before
December 2, 2013.  (*Id.*)

The Appeals Council made the following findings:

> The Appeals Council adopts Findings Nos. 1
> through 5 of the Administrative Law Judge's
> decision, modifies Finding Nos. 6 and 7, and
> adds Finding No. 8 as follows:

> 6.   The claimant is unable to perform past
>      relevant work as a housekeeper because
>      of her exertional limitations, which
>      limit her to sedentary work.

> 7.   If the claimant had the capacity to
>      perform the full range of the sedentary
>      exertional level, 20 CFR 404.1569 and
>      416.969 and Rule 201.18, Table No. 1 of
>      20 CFR Part 404, Subpart P, Appendix 2,
>      would direct a conclusion of not
>      disabled.  Although the claimant's
>      exertional and nonexertional impairments
>      do not allow her to perform the full

22

> > range of the sedentary exertional level,
> > using the above-cited Rule as a
> > framework for decision-making, there are
> > a significant number of jobs in the
> > national economy which she could perform
> > such as surveillance-system monitor,
> > addressing clerk, and assembler of small
> > parts.
>
> > 8.   The claimant is not disabled as defined
> >      in the Social Security Act at any time
> >      through the date of the Administrative
> >      Law Judge's decision, December 2, 2013.

(Doc. 10-2 at 6-7.)

## II. Disability Determination Process

The Commissioner is required to use a five-step analysis to determine whether a claimant is disabled.[1]  It is necessary for the Commissioner to ascertain: 1) whether the applicant is engaged in a substantial activity; 2) whether the applicant is severely

---

[1]  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less that 12 months . . . ."  42 U.S.C. § 423(d)(1)(A).  The Act further provides that an individual is disabled

> > only if his physical or mental impairment or
> > impairments are of such severity that he is not
> > only unable to do his previous work but cannot,
> > considering his age, education, and work
> > experience, engage in any other kind of
> > substantial gainful work which exists in the
> > national economy, regardless of whether such
> > work exists in the immediate area in which he
> > lives, or whether a specific job vacancy exists
> > for him, or whether he would be hired if he
> > applied for work.

42 U.S.C. § 423(d)(2)(A).

impaired; 3) whether the impairment matches or is equal to the requirements of one of the listed impairments, whereby he qualifies for benefits without further inquiry; 4) whether the claimant can perform his past work; 5) whether the claimant's impairment together with his age, education, and past work experiences preclude him from doing any other sort of work.  20 C.F.R. §§ 404.1520(b)-(g), 416.920(b)-(g); *see Sullivan v. Zebley*, 493 U.S. 521, 110 S. Ct. 885, 888-89 (1990).

If the impairments do not meet or equal a listed impairment, the ALJ makes a finding about the claimant's residual functional capacity based on all the relevant medical evidence and other evidence in the case record.  20 C.F.R. § 404.1520(e); 416.920(e). The residual functional capacity assessment is then used at the fourth and fifth steps of the evaluation process.  *Id.*

The disability determination involves shifting burdens of proof.  The initial burden rests with the claimant to demonstrate that he or she is unable to engage in his or her past relevant work.  If the claimant satisfies this burden, then the Commissioner must show that jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform.  *Mason v. Shalala*, 993 F.2d 1058, 1064 (3d Cir. 1993).

As set out above, the instant decision was initially decided at the fourth step of the process when the ALJ found that Plaintiff was capable of performing her past relevant work.  (R. 24.)  The

24

ALJ alternatively decided that Plaintiff could perform other jobs at the light exertional level that existed in significant numbers in the national economy.  (R. 25.)  However the Appeals Council determined Plaintiff could not perform her past relevant work as a housekeeper because she was limited to sedentary work but there were a significant number of jobs Plaintiff could perform.  (R. 6-7.)  Therefore, Plaintiff's case was ultimately decided at step five.

### III. Standard of Review

This Court's review of the Commissioner's final decision is limited to determining whether there is substantial evidence to support the Commissioner's decision.  42 U.S.C. § 405(g); *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999).  Substantial evidence means "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *see also Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981)*.*  The Third Circuit Court of Appeals further explained this standard in *Kent v. Schweiker*, 710 F.2d 110 (3d Cir. 1983).

> This oft-cited language is not . . . a talismanic or self-executing formula for adjudication; rather, our decisions make clear that determination of the existence *vel non* of substantial evidence is *not* merely a quantitative exercise.  A single piece of evidence will not satisfy the substantiality test if the Secretary ignores, or fails to resolve, a conflict created by countervailing evidence.  Nor is evidence substantial if it

> is overwhelmed by other evidence--
> particularly certain types of evidence (e.g.,
> that offered by treating physicians)--or if
> it really constitutes not evidence but mere
> conclusion. *See* [*Cotter*, 642 F.2d] at 706
> ("'Substantial evidence' can only be
> considered as supporting evidence in
> relationship to all the other evidence in the
> record.") (footnote omitted).  The search for
> substantial evidence is thus a qualitative
> exercise without which our review of social
> security disability cases ceases to be merely
> deferential and becomes instead a sham.

*Kent*, 710 F.2d at 114.

This guidance makes clear it is necessary for the Secretary to analyze all evidence.  If she has not done so and has not sufficiently explained the weight given to all probative exhibits, "to say that [the] decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational."  *Dobrowolsky v. Califano*, 606 F.2d 403, 406 (3d Cir. 1979).  In *Cotter*, the Circuit Court clarified that the ALJ must not only state the evidence considered which supports the result but also indicate what evidence was rejected: "Since it is apparent that the ALJ cannot reject evidence for no reason or the wrong reason, an explanation from the ALJ of the reason why probative evidence has been rejected is required so that a reviewing court can determine whether the reasons for rejection were improper." *Cotter*, 642 F.2d at 706-07.  However, the ALJ need not undertake an exhaustive discussion of all the evidence.  *See*, *e.g.*, *Knepp v.*

26

*Apfel*, 204 F.3d 78, 83 (3d Cir. 2000). "There is no requirement that the ALJ discuss in its opinion every tidbit of evidence included in the record." *Hur v. Barnhart*, 94 F. App'x 130, 133 (3d Cir. 2004). "[W]here [a reviewing court] can determine that there is substantial evidence supporting the Commissioner's decision, . . . the *Cotter* doctrine is not implicated." *Hernandez v. Commissioner of Social Security*, 89 Fed. Appx. 771, 774 (3d Cir. 2004) (not precedential).

A reviewing court may not set aside the Commissioner's final decision if it is supported by substantial evidence, even if the court would have reached different factual conclusions. *Hartranft*, 181 F.3d at 360 (*citing Monsour Medical Center v. Heckler*, 806 F.2d 1185, 1190-91 (3d Cir. 1986); 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . ."). "However, even if the Secretary's factual findings are supported by substantial evidence, [a court] may review whether the Secretary, in making his findings, applied the correct legal standards to the facts presented." *Friedberg v. Schweiker*, 721 F.2d 445, 447 (3d Cir. 1983) (internal quotation omitted). Where the ALJ's decision is explained in sufficient detail to allow meaningful judicial review and the decision is supported by substantial evidence, a claimed error may be deemed harmless. *See, e.g., Albury v. Commissioner of Social Security*, 116 F. App'x 328, 330 (3d Cir.

2004) (not precedential) (citing *Burnett v. Commissioner*, 220 F.3d 112 (3d Cir. 2000) ("[O]ur primary concern has always been the ability to conduct meaningful judicial review."). An ALJ's decision can only be reviewed by a court based on the evidence that was before the ALJ at the time he or she made his or her decision. *Matthews v. Apfel*, 239 F.3d 589, 593 (3d Cir. 2001).

## IV. Discussion

### A. General Considerations

At the outset of our review of whether the ALJ has met the substantial evidence standard regarding the matters at issue here, we note the Third Circuit has repeatedly emphasized the special nature of proceedings for disability benefits. *See Dobrowolsky*, 606 F.2d at 406. Social Security proceedings are not strictly adversarial, but rather the Social Security Administration provides an applicant with assistance to prove his claim. *Id.* "These proceedings are extremely important to the claimants, who are in real need in most instances and who claim not charity but that which is rightfully due as provided for in Chapter 7, Subchapter II, of the Social Security Act." *Hess v. Secretary of Health, Education and Welfare*, 497 F. 2d 837, 840 (3d Cir. 1974). As such, the agency must take extra care in developing an administrative record and in explicitly weighing all evidence. *Dobrowolsky*, 606 F.2d at 406. Further, the court in *Dobrowolsky* noted "the cases demonstrate that, consistent with the legislative purpose, courts

28

have mandated that leniency be shown in establishing the claimant's disability, and that the Secretary's responsibility to rebut it be strictly construed."   *Id.*

**B.   *Plaintiff's Alleged Errors***

As set out above, Plaintiff alleges the following:  1) there is a lack of substantial evidence to support the ALJ's rejection of Plaintiff's treating providers (Doc. 11 at 5); and 2) the Appeals Council erred in refusing to consider new evidence which was unavailable at the time of the hearing (*id.* at 9).  We will first consider whether the Appeals Council erred in refusing to consider new evidence.

**1.   <u>New Evidence Presented to Appeals Council</u>**

Plaintiff maintains that Dr. Tuffaha's January 10, 2014, letter is pertinent to establishing that Plaintiff has been disabled by her herniated lumbar disc for a period in excess of a year, from December 2012 through January 2014.  (Doc. 11 at 10.) Plaintiff adds there is no indication that her conditioned worsened between December 2, 2013, and January 10, 2014.  I conclude this claimed error is cause for remand.

The Appeals Council conclusorily stated this evidence related only to a time after December 2, 2013.  (R. 4.)  Dr. Tuffaha does not point to new problems in his January 10, 2014, correspondence. (Doc. 11-1 at 1.)   Rather he references Plaintiff's ongoing condition.  (*Id.*)  The record shows that Plaintiff complained of

severe exacerbation of her left low back pain associated with left post lateral leg pain at her November 2013 visit with Dr. Tuffaha which was her last visit with him before the ALJ's December 2, 2013, decision.  (R. 839.)  Upon examination, Dr. Tuffaha recorded some limitations and opined that the recent exacerbation could be inflammatory.  (*Id.*)  Dr. Tuffaha's January 10, 2014, examination resulted in him expressing his belief that Plaintiff was not able to engage in gainful employment, and his request that she continue the modified activities and medications. (Doc. 11-1 at 1.)  He added that he would re-evaluate Plaintiff in two months. (*Id.*) To conclude that Dr. Tuffaha's assessment about Plaintiff's limitations expressed on January 10, 2014, does not relate to the relevant time period ignores his ongoing treatment of Plaintiff for her back problems and his specific reference in his instruction to Plaintiff to "*continue* the modified activities." (Doc. 11-1 at 1 (emphasis added).)  We find no evidence that Plaintiff's problems/symptoms/limitations developed or significantly changed after December 2, 2013.  The Appeals Council does not point to any such evidence, nor does Defendant do so in her opposition brief. Therefore, I conclude this matter must be remanded to the Acting Commissioner for further consideration of this relevant evidence.

2.   **Treating Provider Opinions**

Plaintiff asserts there is a lack of substantial evidence to support the ALJ's rejection of Plaintiff's treating providers.

(Doc. 11 at 5.)  To the extent remand is required to consider additional evidence from Dr. Tuffaha, discussion of this claimed error as it relates to him is unwarranted.

However, I find no error in the ALJ's consideration of the evidence related to Plaintiff's mental impairments.  Affording little weight to a check-the-box opinion is appropriate and this is the format in which Dr. Reed expressed his opinion that Plaintiff was unable to work because of her major depressive disorder.  *Mason v. Shalala*, 994 F.2d 1058 (3rd Cir. 1993) ("Form reports in which a physician's obligation is only to check a box or fill in a blank are weak evidence at best.")  Though Plaintiff states that the ALJ should have provided more explanation for his acceptance of the State agency reviewer, Francis Murphy, Ph.D., and acceptance of Dr. Murphy's opinion needed to be supported by substantial evidence in the record, Plaintiff does not point to specific evidence other than the form opinion mentioned above.  (Doc. 11 at 9-10.)  This is not sufficient to satisfy her burden, particularly in that Plaintiff does not counter the evidence related to Plaintiff's mental impairment cited by the ALJ in support of his decision.  (R. 23.)

I also conclude that Plaintiff's assertion concerning the relationship between her depression and back pain is without merit. Plaintiff maintains the ALJ erred in failing "to consider or address the fact that Plaintiff's painful spinal condition is

superimposed on her depression.  With the pain added to the depression, it is probable that she will be off task more than 20% of the work day, such that the vocational expert would evaluate her as incapable of competitive employment."  (Doc. 11 at 9.) Plaintiff's asserted probability is not supported by any evidence.[2] Thus, Plaintiff has not met her burden of showing merit regarding this claimed error.

### V. Conclusion

For the reasons discussed above, this matter is properly remanded to the Acting Commissioner for further consideration.  An appropriate Order is filed simultaneously with this action.

S/Richard P. Conaboy
RICHARD P. CONABOY
United States District Judge

DATED: December 16, 2015

---

[2] Though not evidence of record, Dr. Tuffaha's January 10, 2014, correspondence indicates improved depression and anxiety. (Doc. 11-1 at 1.)